Bernard DEPREE, Petitioner–Appellant,

v.

A.G. THOMAS, Warden and Michael J. Bowers, Respondents–Appellees.

No. 86–8167.

United States Court of Appeals, Eleventh Circuit.

Nov. 5, 1991.

Paul Hanes, Atlanta, Ga. (Court-appointed), for petitioner-appellant.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondents-appellees.

Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge, and ROETTGER*, Chief District Judge.

TJOFLAT, Chief Judge:

Petitioner, Bernard Depree, was convicted in 1978 for armed robbery and murder; he is presently serving three life sentences for these crimes. In this appeal from the district court's dismissal of his petition for writ of habeas corpus, Depree raises over twenty claims challenging the constitutionality of his convictions. After reviewing these claims, we conclude that there was no error and, accordingly, affirm the district court's dismissal of Depree's habeas corpus petition.

I.

In May 1978, four armed men robbed the Dixie Furniture Store in Atlanta, Georgia. During the course of this robbery, one of the men shot and killed an Atlanta policeman, Frank Robert Schlatt, who had responded to a silent alarm triggered at the store. In June 1978, Depree, Warren McCleskey, David Burney, Jr., and Ben Wright were indicted for two counts of robbery and for the murder of Officer Schlatt. The State tried McCleskey alone, and a jury found him guilty of armed robbery and murder and sentenced him to death. *See McCleskey v. Zant,* — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Depree and Burney were tried together; both put forth alibi defenses, claiming that they were not at the Dixie Furniture Store at the time of the robbery

---

* Honorable Norman C. Roettger, Jr., Chief U.S. District Judge for the Southern District of Florida, sitting by designation.

and murder. A jury convicted both of them, and they each received three consecutive life sentences.[1] Wright testified on behalf of the State against his three accomplices in exchange for a recommendation by the district attorney of a twenty-year sentence.

On direct appeal, the Supreme Court of Georgia affirmed Depree's convictions and sentences. *Depree v. State*, 246 Ga. 240, 271 S.E.2d 155 (1980). Depree then filed a petition for habeas corpus relief in the Superior Court of Tattnall County.[2] Following two evidentiary hearings, the court, on March 4, 1985, denied the requested relief. The Supreme Court of Georgia, on May 1, 1985, denied Depree's application for a certificate of probable cause to appeal.

On August 14, 1985, Depree, acting pro se, petitioned the district court for federal habeas corpus relief, raising thirty claims. The district court, after finding that no evidentiary hearing was necessary, concluded that the claims were meritless and dismissed the petition. Depree then appealed.

Following developments in McCleskey's federal habeas corpus proceedings, Depree asked us to remand his case to the district court so that he could pursue a claim based on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). We granted Depree's request and, while retaining jurisdiction of his appeal, remanded the case to the district court for that purpose. Subsequently, we expanded the scope of the remand to allow Depree to litigate a claim based on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). After conducting an evidentiary hearing, the district court, on July 10, 1990, held that Depree's *Massiah* and *Giglio* claims were meritless. The district court's decision is now before us.

Of the claims Depree presents on appeal, only five merit discussion.[3] Three of these claims, addressed in part II, are that the trial court denied Depree a fair trial, in violation of his due process rights, by: (1) erroneously rejecting Depree's challenges for cause to two venirepersons (who became jurors); (2) erroneously denying Depree's motions to sever his trial from Bur-

---

1. The State waived its right to seek a death sentence for either Depree or Burney, and, thus, under Georgia law, the State could try them jointly. *See* Ga.Code Ann. § 17-8-4 (1990) (formerly Ga.Code Ann. § 27-2101 (1971)).

2. Apparently, before filing this state petition, Depree filed two other state habeas corpus petitions, neither of which was addressed on the merits. He filed the first petition in the Superior Court of Fulton County; the court, finding that counsel had abandoned the petition, dismissed it on September 28, 1982. He filed the second petition in the Superior Court of Tattnall County; the court dismissed this petition on Depree's motion.

3. We conclude that Depree's other claims are patently meritless. These claims are: (1) the state magistrate erred in issuing an arrest warrant without probable cause; (2) the state magistrate improperly "committed" Depree, i.e., denied him bail pending trial, based on his coconspirators' (Burney's and Wright's) confessions; (3) the state magistrate and the trial court erroneously expressed their opinions in the case and should have disqualified themselves; (4) the State relied on untruthful and illegally obtained evidence to indict him; (5) the trial court erred in including him in a post-indictment lineup; (6) the State failed to provide exculpatory evidence, as required by *Brady v. Maryland*, 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (7) the State knowingly used perjured testimony at trial; (8) the State improperly played on the "fears, prejudice, and sympathy of the jury" in examining witnesses; (9) the trial court improperly restricted his right to cross-examine two witnesses; (10) the trial court admitted into evidence certain "projectile fragments" although the State did not establish the chain of custody; (11) the trial court allowed a State witness to testify on rebuttal even though the witness was not on the State's witness list; (12) the trial court's charge to the jury regarding confessions improperly shifted the burden of proof, requiring him to prove he did not confess; (13) the State improperly informed the jurors that they were "the judges of law and facts"; (14) the trial court erred in dismissing his motion, and his extraordinary motion, for a new trial; (15) the State altered the transcripts of his preliminary hearing, arraignment, and trial, rendering his right to appeal illusory; (16) his lawyer rendered ineffective assistance of counsel by: placing Depree's character in issue at trial, failing to investigate fully into possible defenses, and failing to file a brief in support of his motion for a new trial; (17) his attorney also rendered ineffective assistance on appeal; (18) the state habeas corpus court erred by: denying him the right to test the sufficiency of the evidence, relying on allegedly altered transcripts of his trial, and granting the State "numerous" continuances.

ney's, and; (3) erroneously allowing the prosecutor, during closing argument, to comment on Depree's pre-arrest silence. The two remaining claims, addressed in part III, are that the State's use of certain witnesses, and these witnesses' testimony, violated his due process rights, under *Massiah* and *Giglio*.

## II.

### A.

■ Depree claims that the trial court erroneously rejected his challenges to two venirepersons who eventually were empaneled on the jury that convicted him. The two at issue, Isaac M. Hodgkins and Sonja Reynolds, both had some connection with law enforcement: Hodgkins was an ex-deputy sheriff and Reynolds had relatives who served on the Atlanta police force. Depree contends that the voir dire examination established that these venirepersons, because of their association with law enforcement, could not judge impartially a case involving the murder of an Atlanta policeman.[4] Thus, he argues, these individuals were unqualified to sit on the jury, and the trial court's failure to accept his challenges for cause and to exclude them rendered his trial fundamentally unfair.

■ Generally, "a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief." *Rogers v. McMullen*, 673 F.2d 1185, 1189 (11th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 740, 74 L.Ed.2d 961 (1983). "The decision to excuse a [prospective] juror for cause upon a suggestion of partiality is within the sound discretion of the trial judge." *United States v. Taylor*, 554 F.2d 200, 202 (5th Cir.1977).[5] The trial judge must consider whether the prospective juror has such a fixed opinion, based on his bias, that he "could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). Whether an individual is so partial that he must be disqualified is "plainly [a question] of historical fact." *Id.* at 1036, 104 S.Ct. at 2891. Thus, on federal habeas corpus review, a state court's determination as to the partiality of a particular juror is entitled to a presumption of correctness. 28 U.S.C. § 2254(d) (1988). In reviewing such a finding, then, we will not set it aside "unless the error is manifest." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961) (quoting *Reynolds v. United States*, 98 U.S. 145, 156, 25 L.Ed. 244 (1878)). In other words, "the question is whether there is fair support in the record for the state court['s] conclusion that the jurors here would be impartial." *Patton*, 467 U.S. at 1038, 104 S.Ct. at 2892–93.[6]

---

4. Depree also urges us to adopt a per se rule of disqualification, in cases involving the murder of a police officer, for ex-police officers or persons related to police officers. In support of such a rule, Depree cites *Hutcheson v. State*, 246 Ga. 13, 268 S.E.2d 643, 644 (1980). In that case, the Georgia Supreme Court adopted a prophylactic rule requiring courts, in criminal cases, to accept all challenges for cause to the empanelment of active police officers. *See also King v. State*, 173 Ga.App. 838, 328 S.E.2d 740, 741 (1985). The Georgia Supreme Court, however, has refused to extend *Hutcheson* in the manner Depree suggests. *See Depree*, 271 S.E.2d at 158. Depree cites no additional caselaw to support his position. We consider such a per se rule to be at odds with the United States Supreme Court's instructions on how to evaluate the qualifications of individuals for jury service. *See generally Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Accordingly, we decline Depree's invitation to formulate this prophylactic rule.

5. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

6. Depree contends that we may disregard the presumption of correctness in this case because his due process right to a fair trial by an impartial jury was violated. Although 28 U.S.C. § 2254(d)(7) does direct us to question, rather than presume, the correctness of a state court's factual findings if the petitioner "was otherwise denied due process of law in the State court proceeding," this does not mean that no presumption of correctness attaches whenever a petitioner alleges a due process violation. Rather, we must ask whether the state court denied the petitioner a fair opportunity to press his claim below; if it did not, we will not attach a presumption of correctness to the state court's factual findings. Thus, for § 2254(d)(7) to ap-

Depree first challenged Hodgkins, an ex-deputy sheriff. The relevant portion of Hodgkins' voir dire examination is as follows:[7]

Q: [by Mr. Gailey, attorney for defendant Burney] Sir, do you have any relatives now or have you had any in the past who have been in the field of law enforcement?

A: [by Hodgkins] Me.

Q: You have been employed in the field of law enforcement?

A: I am an ex-deputy sheriff in Clayton County.

Q: When were you a deputy sheriff?

A: '71 to about June of '72.

Q: Sir, this involves the death of an Atlanta policeman. The fact that you are an ex-law enforcement officer, would that affect the way you would think in this case?

A: Yes, I am afraid it would. Even though I have been out of it, I still think about it and it gets in your blood.

Q: Do you think if the Court charged you that you would be able to set aside your personal feelings and—

A: Yes, I can try.

Q: Are you sure that you could?

A: Yes.

Q: You are sure you could set aside your personal feelings?

A: Yes.

Q: Is there any possibility that you could not set aside your personal feelings?

A: I would like to think not.

Q: You can't state for sure that you can't?

A: No, I can't state for sure.

. . . .

Q: Sir, I would like to get back to a few questions back. I believe if I heard you correctly, you said the fact that you were an ex-policeman could influence the way that you would view this case. Is that what you said?

A: That's a good possibility, I believe it might and could.

MR. GAILEY: Your Honor, we would like to excuse this juror for cause.

THE COURT: Mr. Hodgkins, do you believe that you could be a fair and impartial juror, that is, fair to the State and to the defendants, in the trial of this case?

THE JUROR: Like I told the attorney, I would like to think that I could, yes, sir.

THE COURT: All right, sir. I will rule that the gentleman is qualified as a juror.

 According to Depree, this colloquy demonstrated that Hodgkins could not be impartial in evaluating Depree's case;[8] thus, the trial court erred in denying the challenge for cause to Hodgkins' service on the jury.[9] We disagree. As Depree points out, some of Hodgkins' answers raised the possibility that he would not be impartial. Hodgkins admitted that his status as an ex-deputy sheriff would affect "the way [he] would think in th[e] case"; he reiterated this point later in the voir dire, confessing that his status as an ex-police officer "might and could" influence the way that he would view the case. Throughout this

---

ply here, Depree would have to allege that the State denied him due process during the jury selection phase of the trial; this claim would impugn the reliability of the state court's factual findings. Depree makes no such claim; indeed, the record demonstrates that the state court allowed Depree to interrogate fully the venirepersons and to challenge their empanelment.

**7.** The parties examined each venireperson individually, with the remainder of the venire sequestered. The parties made, and the court ruled on, challenges for cause during these individual examinations. After all qualified venirepersons had been identified, the venire (apparently, a number sufficient to accommodate the parties' peremptory challenges, a jury of 12, and

two alternates) was brought into the courtroom. At that time, the trial judge called, seriatim, the name of each venireperson and the parties exercised their peremptory strikes. This process continued until the parties had picked 12 jurors and two alternate jurors. *See also infra* note 13.

**8.** Depree does not claim that the trial court prohibited his counsel from fully questioning Hodgkins, rendering the voir dire examination, itself, constitutionally inadequate.

**9.** Depree exhausted all of his peremptory strikes before Hodgkins was called. *See supra* note 7. Thus, the trial court's rejection of Depree's challenge for cause to Hodgkins' service on the jury, if erroneous, presumably harmed Depree.

examination, however, Hodgkins continually asserted that he would be able to set aside his personal feelings in evaluating Depree's case. Following counsel's questions about Hodgkins' possible bias as an ex-deputy sheriff, the trial court inquired whether Hodgkins could judge Depree fairly and impartially; Hodgkins affirmed that he could. The record does not support Depree's assertion that the trial court manifestly erred in evaluating Hodgkins' ability to act impartially as a juror.[10] At most, the record establishes that Hodgkins might have brought a bias to the courtroom door;

10. The trial court, in rejecting Depree's challenge for cause against Hodgkins, implicitly concluded that Hodgkins would judge Depree fairly and impartially.

11. Depree relies heavily on *United States v. Martin,* 749 F.2d 1514 (11th Cir.1985). In *Martin,* the defendant, charged with aiding and abetting a codefendant's bank robbery, challenged for cause a prospective juror, Ms. Boothe, who was a bank employee and knew a coworker who had experienced a bank robbery. Ms. Boothe admitted, during voir dire, that, because of her status as a bank employee and her coworker's experience, she "could probably be swayed against the defendant easily." *Id.* at 1516. The trial judge, following the defendant's challenge, asked Ms. Booth if she could restrict her deliberations, as a juror, to the evidence presented in the courtroom; she stated that she could. The judge then denied the defendant's motion. The defendant's counsel then questioned Ms. Boothe further. In response to his questions, she stated that "[i]f there is the slightest bit of doubt of his innocence, I would feel that ... I would try to weigh what was said in the courtroom, but the slightest bit of doubt, I would say he was guilty probably." *Id.* The defendant renewed his challenge to Ms. Boothe and the court denied it again.

On appeal, we held that the trial judge had erred in denying the defendant's motion. We noted that Ms. Boothe's testimony had raised two concerns: (1) that she might be affected by matters not in evidence and (2) that she might presume guilt rather than innocence. The trial judge's questions, we concluded, only addressed the former concern; the judge never inquired whether Ms. Boothe could set aside her admitted bias and impartially judge the defendant, presuming his innocence. Additionally, we found that after the judge had questioned Ms. Boothe, she expressed reservations about her ability to limit her evaluation of the defendant's case to evidence presented during the trial. Thus, in *Martin* the prospective juror's statements, during voir dire, raised substantial doubts about her ability fairly and impartially to judge the defendant, doubts that the trial

it does not demonstrate that Hodgkins could not leave his bias outside that door.[11] Accordingly, we will not disturb the trial judge's conclusion that Hodgkins could evaluate Depree's case impartially and fairly and was, thus, qualified to serve as a juror.[12]

The second venireperson Depree challenged was Sonja Reynolds. The parties picked Reynolds as the first alternate juror and, at the commencement of the trial, following the subsequent disqualification of a juror, the court empaneled Reynolds.[13] Depree claims that Reynolds'

judge's questions either did not alleviate or did not address.

In the present case, Hodgkins' statements indicated some potential bias, although certainly less than that shown by Ms. Boothe. On further investigation, however, Hodgkins alleviated this concern by stating that he would be able to judge the defendant fairly and impartially. Furthermore, the trial judge's questions addressed the concerns that Hodgkins' answers raised on voir dire. Unlike in *Martin,* then, the record in this case does not demonstrate that the trial judge manifestly erred in evaluating the prospective juror's impartiality.

12. As the Supreme Court noted in *Patton,* the process of determining, at voir dire, whether a particular venireperson is biased essentially involves an analysis of the individual's credibility and, therefore, his or her demeanor. *See Patton,* 467 U.S. at 1038, 104 S.Ct. at 2892; *see also Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) ("The trial judge's function at [voir dire] is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions."). Accordingly, it is generally proper for a reviewing court, which must rely on a cold record, to defer to the conclusions reached by the trial judge on this issue.

13. After selecting the jury, the parties chose two alternates; the court gave the defense four peremptory challenges to alternate jurors. The parties picked Reynolds, the first venireperson called, as the first alternate juror. Depree did not subsequently exercise all of his alternate-juror peremptory challenges; rather, only three of the four were used.

Given this scenario, it might be suggested that Depree waived his right to question the trial judge's denial of his challenge for cause to Reynolds. In *United States v. Mobley,* 656 F.2d 988 (5th Cir. Unit B, Sept.1981), however, we rejected such a claim. "[T]o argue that counsel

voir dire examination established that she could not judge his case impartially. Once again, we disagree. As with Hodgkins, the most Reynolds' examination established was that she might have a bias. After extensive questioning, however, it became apparent to the trial judge that Reynolds could judge Depree's case fairly and impartially based on the evidence presented at trial. The record does not demonstrate that the trial judge manifestly erred in evaluating Reynolds' impartiality.[14] Ac-

waives [a challenge for cause] by failing to use an available peremptory strike to dismiss that juror ... is to contend that counsel must sacrifice one of the peremptory challenges rightfully available to him or her in order to strike a juror who could properly be challenged for cause.... There is no support ... for requiring such a trade-off." *Id.* at 990. We note, however, that Depree's failure to exercise such a challenge, when he knew the order in which the venirepersons would be called for duty and, thus, could finely plot his strategy, *see infra* note 7, does call into question the seriousness of his objection to Reynolds' service as a juror.

14. Reynolds' extensive voir dire, in pertinent part, went as follows:

Q: [by Mr. Gailey] Ma'am, do you have now or have you had in the past any relatives or close friends who were employed as law enforcement personnel?

A: [by Reynolds] Yes, I do.

Q: Ma'am, could you tell us who they are and what kind of jobs they hold?

A: W. Stewart, brother-in-law, Officer C. Boyd.

Q: All right, Ma'am, where are they employed?

A: In Atlanta.

Q: City of Atlanta Police Department?

A: Yes.

Q: That is your brother-in-law?

A: And first cousin.

Q: Ma'am, this case involves the death of an Atlanta policeman. Do you think that because of these relatives that you have that are Atlanta policemen, do you feel like that could influence your decision and tend to make you not impartial?

A: Well, I can't really answer that.

Q: All right. Ma'am, let me ask you if the Judge instructed you that you could not let your personal feelings come into play in determining the verdicts in this case, could you set aside those personal feelings and look at the facts objectively, or would your relationship with these close relatives who are Atlanta policemen, would that enter into your decision making?

A: I'm quite sure it would have some influence over it.

Q: So do you feel you could not follow this Court's instruction as far as excluding that entirely?

A: I cannot exclude it entirely.

MR. GAILEY: We would like to ask that this juror be excused for cause.

THE COURT: Miss Reynolds, only you could know this. Are you saying you could not be a fair and impartial juror and decide this case on the evidence presented in this case?

THE JUROR: Your Honor, I would think I would do the best I could to give a fair judgment, yes. I would do the best I could.

THE COURT: Do you have any doubt about your ability to be fair and impartial in this case?

THE JUROR: No, I don't have any doubt about being fair and impartial.
....

Q: [by Mr. Gailey] There has been some publicity about this. Have your heard any publicity about this case?

A: I vaguely remember when it happened.

Q: Can you tell us what you heard about that or what you remember hearing?

A: No more than we—I think if this is the same case, when the officer answered a call—

Q: Yes, ma'am.

A: —and he was shot, that is all.

Q: Have you ever heard your brother-in-law and first cousin talk about this case?

A: No.

Q: Ma'am, we anticipate there are going to be some policemen testify in this proceeding. Would the fact that the witness is a policeman, that by itself, would that tend to make his testimony more believable to you or more believable than say someone who is not a policeman?

A: No, not necessarily so.

Q: Ma'am, do you think it's possible for policemen to make mistakes?

A: I think everybody is entitled to make mistakes, I'm quite sure.

Q: And do you think it's possible that the police could arrest the wrong person for a crime?

A: It's possible, yes.

Q: Ma'am, do you feel that if someone is arrested, that the mere fact that they are arrested, do you feel that that indicates they have been involved in whatever it was they were arrested for?

A: I guess it depends on the evidence.

Q: All right. Let me see if I can rephrase that and make it a little clearer.

Do you believe where there is smoke there is fire; if someone was arrested for a crime he had to have been involved in it in some manner? Do you believe that?

A: Just as I said, I mean, it just depends on the evidence and whatever is brought forth.

Q: All right. If the Court instructed you that you were not to let your personal feelings on that matter interfere with your deliberations, do you think you could set aside those person-

cordingly, we affirm the district court's conclusion that the trial court properly rejected the petitioner's challenges for cause.

### B.

 Depree next contends that the trial court erroneously denied his motion to sever his trial from Burney's and that this error deprived him of a fair trial.[15] Depree's claim rests upon the alleged prejudice caused him by the admission of his codefendant's, Burney's, confession into evidence; in this confession, Burney identified Depree as a coconspirator. He does not claim that his and Burney's defenses were antagonistic; nor does he claim that admission of Burney's confession violated the confrontation clause, *see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Instead, he argues that due process required the trial court to sever the trials because it was impossible for the jury, despite the trial court's instruction to the contrary, to ignore Burney's properly admitted confession when judging his (Depree's) case.

 We disagree. Depree concedes that the trial court properly admitted, in accordance with the confrontation clause and state evidentiary rules, Burney's confession into evidence. Depree's argument, then, is that due process requires stricter limits on the admissibility of a codefendant's confession than those imposed by the confrontation clause and the rules of evidence. According to Depree, these limits imposed by the due process clause must protect a defendant from the inculpatory effects of his codefendant's admissible confession. There is no support for this position. The Constitution simply does not require that every defendant be insulated at trial from the damaging testimony of his codefendant. While Depree may have gained a tactical advantage had the trials been severed, such advantage is not required or guaranteed by the Constitution. Depree had ample opportunity to present his case and vigorously cross-examine those witnesses who incriminated him. Therefore, we find no constitutional error in the trial court's denial of Depree's motion for a severance.

### C.

Depree claims that the prosecutor erred in commenting, during closing argument to the jury, on Depree's failure to make certain statements to the police following his arrest. Depree took the stand in his own defense and presented the alibi he had given the police following his arrest. As part of his testimony, he stated that on the day of the crime, between 2:00 p.m. and 2:30 p.m., he saw his "son's mother" on Peachtree Street, away from the scene of the crime. His attorney asked him whether he

---

al feelings and look objectively at the evidence that is presented?
A: Yes, I could.
Q: I notice some hesitation there.
THE COURT: You have asked her the same question more than once. Go on if you want to ask it again. I will let you ask it three times, but that is all.
. . . .
Q: Is that an absolute equivocable yes you can exclude it or is there some possibility in you mind that subconsciously this could come back into it?
A: I would do the best I could to give the best judgment.
MR. GAILEY: Your Honor, we renew our motion.
THE COURT: I deny your motion.

**15.** Depree moved for severance three times. He filed the first motion prior to the commencement of the trial. The second came after the trial court conducted a hearing, pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), to determine whether Burney had confessed voluntarily after being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Neither of these rulings denied Depree a fair trial; at the time the court made them, it did not appear that Depree would suffer any prejudice by a joint trial. Depree made his third, and final, motion for severance (which, in effect, was a motion for mistrial) during the State's case in chief—after Detective Welcome Harris Jr. of the Atlanta Bureau of Police Services related Burney's confession, recalling part of Burney's statements from memory and reading part of the confession into evidence. Detective Harris carefully replaced Depree's name with the phrase "black male" or "black male subject," in effect redacting Depree's name from Burney's confession. We concentrate on this last motion in the text.

had told the police this fact; Depree answered

> Well, no, and the reason I didn't tell the police this, and I am going to explain to you, is because I had become disgusted, the police kept coming in and going out, you understand, and saying this and saying that, you understand.
>
> ... I just got disgusted and I said to myself, I said, I will tell what I have to say before a jury or to my lawyer.

During his closing argument, the prosecutor discussed Depree's testimony. With respect to Depree's alibi, he argued

> Now, how about the alibi for Depree? Well, the evidence indicates ... when he turned himself in he told the police he was somewhere else, but he didn't tell them what, did he? He said he was out hustling on Peachtree Street.
>
> ... Now, he also told you there was some information he did not give the police, that he gave it to you from the stand when he testified yesterday and that is where he was on the 13th. You see, now he is coming in with the specific information that if he had had it to begin with he should have given it, but he slipped up, ladies and gentlemen.

The prosecutor went on to say that Depree's alibi testimony did not match the facts established at trial. Depree claims that the prosecutor unconstitutionally commented on his post-arrest silence, rendering his trial fundamentally unfair.[16]

■ Our review of the record reveals that Depree did not raise this issue in the district court. He seeks to assert this claim for the first time in this court. We have long held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court. *See Humphrey v. Boney*, 785 F.2d 1495, 1497 (11th Cir.1986).

■ Even assuming arguendo that Depree's claim that the prosecutor impermissibly commented on his silence is properly before us, we find it to be meritless. De-

pree did not exercise his fifth amendment right to remain silent after his arrest. At trial, Depree testified on direct examination that, after his arrest, he gave the police a description of his whereabouts on the day of the armed robbery and murder but that he decided not to tell them that he had seen his son's mother on Peachtree Street that day. In light of the fact that Depree did not exercise his right to remain silent after his arrest, the prosecutor could hardly have commented impermissibly on his silence. Moreover, Depree's testimony regarding his alibi invited the prosecutor's comments. The prosecutor did no more than argue directly from Depree's own testimony that he did not relate his entire alibi to the police. In no way is this a comment on the defendant's silence in violation of *Doyle v. Ohio.*

### III.

#### A.

■ Depree claims that the State violated his right to counsel, guaranteed by the sixth and fourteenth amendments and defined by *Massiah*, 377 U.S. at 201, 84 S.Ct. at 1199, by using jailhouse informants deliberately to elicit incriminating information from him in the absence of counsel. To establish his claim, Depree "must show (1) that a fellow inmate was a government agent; and (2) that the inmate deliberately elicited incriminating statements from" him. *Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir.1987) (per curiam), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988); *see also United States v. Henry*, 447 U.S. 264, 270, 100 S.Ct. 2183, 2186–87, 65 L.Ed.2d 115 (1980). Thus, there are two prongs necessary to prove a *Massiah* violation involving jailhouse informants (or simply a *Henry* claim): the "agency" prong and the "deliberate elicitation" prong.

■ There is, by necessity, no bright-line rule for determining whether an indi-

---

**16.** In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that a prosecutor's use of a defendant's post-arrest silence to impeach the defendant's excul-

patory story, told for the first time at trial, violates the due process clause of the fourteenth amendment.

vidual is a government agent for purposes of the sixth amendment right to counsel. The answer depends on the "facts and circumstances" of each case. *Lightbourne*, 829 F.2d at 1020. At a minimum, however, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place. *Id.* Regarding the "deliberate elicitation" prong, the Supreme Court has explained that

> the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached[ ].... [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed to elicit incriminating remarks.

*Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986) (citation omitted). Thus, we must determine whether the government agent took affirmative steps "designed to elicit incriminating remarks." *Id.*

 Depree first raised a *Massiah* claim related to the testimony of Offie Gene Evans.[17] Evans testified at trial to several incriminating statements made by Depree and McCleskey while they were incarcerated at Fulton County Jail. Depree contends that the prosecution moved Evans to a cell adjacent to Depree's and McCleskey's cells and that Evans, at the prosecutor's behest, elicited incriminating information from them. The district court, after conducting an evidentiary hearing, concluded that Evans was not acting as an agent of the State when he elicited this information. We hold that the district court's factual findings are not clearly erroneous and that they compel the conclusion that Evans was not acting as an agent of the State when he elicited incriminating remarks from Depree and McCleskey. We, therefore, affirm the district court's rejection of this claim.

The police arrested Evans on July 3, 1978 and incarcerated him in Fulton County Jail; Evans had escaped (walked away) from a federal halfway house. Authorities placed Evans in the fourteenth cell on the first floor of the north wing of the jail (cell 1 north 14); Depree was in the cell directly above Evans' (cell 2 north 14); McCleskey was in the cell next to Evans' (cell 1 north 15). On July 12, Evans met with the assistant district attorney prosecuting Depree's case, Russell Parker, and two detectives from the Atlanta Police Department at the Fulton County Jail. It is unclear how this meeting came about: Evans testified that an unknown deputy sheriff suggested to him that he might have heard information of interest to the police and that, at that time, he agreed to talk to the police; Carter Hamilton, a deputy sheriff employed at the jail, testified that Evans approached him, stating that he had information regarding the murder of Officer Schlatt, and that he

---

**17.** As an initial matter, Depree argues that the district court erred in not applying the doctrine of collateral estoppel to his *Massiah* claim involving Evans. McCleskey, Depree's coconspirator, brought a *Massiah* claim involving Evans in his federal habeas proceeding; the district court, in that proceeding, resolved the claim before Depree's hearing took place. In *McCleskey*, the district court held that the State's use of Evans to obtain incriminating information from McCleskey violated *Massiah*; accordingly, the court granted the writ. *McCleskey v. Kemp*, No. C87–1517A (N.D.Ga. Dec. 23, 1987). Depree argues that this conclusion, based on the same testimony as that offered in his case, collaterally estopped the district court in his case from relitigating this issue. According to Depree, the court had no choice other than to issue the writ, based on the district court's judgment in McCleskey's case.

Depree fails to mention, however, that on appeal this court reversed the district court's judgment, holding that McCleskey's claim was an abuse of the writ. *McCleskey v. Zant*, 890 F.2d 342 (11th Cir.1989), *affirmed*, —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In that decision, we did not address the merits of the *Massiah* claim. Thus, when the district court addressed Depree's claim, there was no comparable judgment to which the district court should have deferred. Therefore, without determining whether collateral estoppel would have applied, we conclude that the district court did not err in deciding the issue anew.

(Hamilton) agreed, at that time, to put Evans in touch with Parker and the detectives.[18] In any event, at the July 12 meeting, Evans recounted various incriminating statements regarding the murder of Officer Schlatt made by both Depree and McCleskey during conversations with Evans.[19] On August 1, Evans signed a written statement, memorializing his testimony of July 12; both Evans and Parker testified that the written statement only contained information revealed on July 12.

Detective Welcome Harris and Officer Sidney Dorsey, who both were involved with Depree's case, testified that they did not ask anyone to move Evans to a cell closer to Depree or McCleskey and that they did not suggest to Evans that he try to elicit information from Depree or McCleskey. Hamilton testified that he was unaware of Evans being moved into a different cell in July 1978 and that he did not ask anyone to make such a move; he also denied hearing anyone instruct Evans to elicit incriminating testimony from either Depree or McCleskey. Parker testified that he had neither asked that Evans be moved to a cell closer to Depree or McCleskey nor heard anyone make such a request.

Depree's *Massiah* claim rests on the testimony of Captain Ulysses Worthy, who was in charge of the day watch at Fulton County Jail during the summer of 1978. Worthy testified twice during McCleskey's habeas corpus hearings, on July 9, 1987 and August 10, 1987, and once during Depree's hearings, on September 5, 1989. In what is at times confused and contradictory testimony, Worthy asserted, on both August 10, 1987 and September 5, 1989, that on July 12, 1978, after Evans' meeting with Parker and the detectives, Hamilton asked that Evans be moved to a cell adjacent to McCleskey's; furthermore, he testified that

he had not been asked to move Evans before July 12. Worthy also testified, on July 9, 1987, that some officers had encouraged Evans, at unspecified times, to engage in conversations with someone in a nearby cell to elicit information; on September 5, 1989, however, he testified that he had never heard anyone tell Evans to elicit information from Depree or McCleskey.

The district court found "Worthy's testimony to be inherently contradictory and not credible." The court noted that it was uncontradicted that Evans was already in the cell next to McCleskey's and below Depree's prior to the July 12 meeting with Parker and the detectives; "otherwise, it would have been impossible for Evans to have relayed the content of any conversations he had with McCleskey to Mr. Parker at that meeting." Worthy, however, testified that Evans was not moved next to McCleskey until after this July 12 meeting. After evaluating all of the testimony and evidence, the court found that "Evans was originally placed in Cell 1 North 14, was never moved to another cell which [sic] he was incarcerated at the Fulton County Jail, ... and was not acting at the behest of the police which [sic] he engaged McCleskey and Depree in conversation."

■ We cannot conclude that the district court, in evaluating this evidence, was clearly erroneous. Depree's *Massiah* claim turns, in large part, on the credibility of the witnesses, an evaluation that the district court is better suited to make than we. *See Amadeo v. Zant,* 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988); Fed.R.Civ.P. 52(a). At best, we can only say that Depree's view of the evidence is plausible, as is the district court's; however, "[w]here there are two permissible views of the evidence, the factfinder's

---

**18.** Most of the testimony to which we refer was made during the district court's evidentiary hearing; the district court also relied upon testimony given in McCleskey's habeas corpus proceeding. Evans' testimony was given in deposition.

**19.** It is clear from the record that Evans actively elicited these incriminating statements from Depree and McCleskey. Indeed, to secure these

statements, Evans put forth several lies; for example, Evans told them that he was the uncle of codefendant Ben Wright and that he was supposed to have been a participant in the robbery himself. Thus, it is clear that the "deliberate elicitation" prong of Depree's *Massiah* claim is satisfied. This is, of course, of no moment if Evans was acting alone, rather than as an agent of the State.

choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citing *United States v. Yellow Cab. Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949)). Accepting the facts the district court found, we hold that Depree has failed to show that Evans, when he elicited incriminating statements from Depree, was acting as a government agent. That Evans subsequently joined forces with the prosecution does nothing to prove Depree's claim. Therefore, we affirm the district court's rejection of the *Massiah* claim involving Evans.

Depree also raised a *Massiah* claim based on the testimony of Howard Smith (also known as Terry Ford). Smith was incarcerated in the Fulton County Jail in August 1978 on escape and auto theft charges. While in this jail, he was housed in a cell with Depree and one other inmate. During this time, according to Smith, Depree told Smith that he was involved in the robbery that led to the murder of Officer Schlatt. Additionally, Smith reported that Depree, upon learning that Ben Wright, who had been arrested and incarcerated in the jail, planned to testify against him, asked Smith to get him a knife so that Depree could kill Wright. Shortly after Depree asked Smith to obtain a knife for him, Smith instructed his sister to contact the Atlanta police and tell them that he had information concerning Officer Schlatt's murder. A detective subsequently came to the jail and interviewed Smith. Approximately three weeks later, on November 13, 1978, Smith gave a sworn statement to Harris, in which he related the facts discussed above. Smith testified to these facts, in the State's rebuttal case, at Depree's trial.

■ Depree's *Massiah* claim is based on Smith's testimony during the hearing before the district court. Smith stated that "I was asking him [Depree] the questions[ ] because I was told to find out more infor-

mation from him about what happened;" Smith further stated that Harris instructed him to find out this information. Smith could not recall when this conversation occurred. Harris and Parker did not recall meeting with Smith prior to the time he testified at trial against Depree; they stated, however, that they never had asked any inmate to elicit information from Depree. The district court, after considering the evidence, concluded that "[s]ince Smith had initiated the contact with the police and had already relayed the substance of the information he had gathered from Depree, it is obvious that the statement by Detective Harris is little more than to the effect, 'If you learn any more information, please let us know.' This court holds that such encouragement given to an inmate is insufficient to invoke *Massiah.*"

■ We are not convinced that the district court's conclusion is supported by the record. If Smith's testimony is credited, then Harris' "encouragement" to Smith might demonstrate an arrangement between Smith and the State sufficient to satisfy the "agency" prong of Depree's *Massiah* claim. *Cf. Henry,* 447 U.S. at 271, 100 S.Ct. at 2187 ("Even if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result."). We, however, need not decide that issue. It is clear from the record that Smith gathered the bulk, if not all, of Depree's incriminating statements before he met with Harris. Indeed, according to his November 13, 1978 statement, Smith did not even meet Harris until the day he gave that statement, when he relayed most of the damaging statements made by Depree.[20] Thus, even if we believe Smith's most recent testimony that Harris told him to gather more information from Depree, this encouragement could not have taken place until after

**20.** In the November 13 statement, Smith reported that he met with an unnamed detective from the Atlanta Police Department (not Harris) shortly after his sister called the police for him. After meeting with this detective, Smith "did not

hear anything else from the Atlanta Police Department until [November 13, 1978] when ... Det. Welcome Harris ... came to the Atlanta Police Department and [Smith] made th[e] statement."

Smith gave his November 13, 1978 statement to the police. There is nothing in the record to suggest that Smith was acting as a government agent prior to November 13, 1978, when most of these incriminating statements were collected.

Therefore, we conclude that most of the incriminating testimony gathered by Smith was not tainted by any constitutional violation. Depree has failed to demonstrate that Smith, *while* acting as a state agent, deliberately elicited any information from Depree; furthermore, he has not demonstrated that Smith learned any new information after November 13, 1978, when he may have been acting as a government agent.[21] Moreover, since the State only used, at trial, the information that Smith supplied on November 13, 1978, before he was purportedly acting as a government agent, we conclude that any *Massiah* violation that occurred after November 13, 1978, with respect to Smith, was harmless.

### B.

■ Finally, Depree claims that the State violated his fourteenth amendment right to due process by failing to disclose the prosecution's promises of favorable treatment to witnesses whose testimony was used to obtain his conviction, in violation of *Giglio,* 405 U.S. at 150, 92 S.Ct. at 763. "The thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony." *Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983). This is important because quite often "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

■ As with his *Massiah* claims, Depree's *Giglio* claims center on Evans and Smith. Evans testified, in McCleskey's state habeas corpus hearing, that a detective promised to "speak a word" in Evans' behalf in his own case. Following Depree's trial, the prosecutor contacted federal authorities to advise them of Evans' cooperation and the escape charges against him were dropped. This court, en banc, has considered once before whether the above testimony demonstrated that the State failed to disclose a promise of favorable treatment to Evans, in violation of *Giglio.* See *McCleskey v. Kemp,* 753 F.2d 877, 882–85 (11th Cir.1985) (en banc), *affirmed in part,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (not addressing *Giglio* claim). In *McCleskey,* evaluating this evidence, we held that "[t]he detective's statement offered such a marginal benefit ... that it is doubtful it would motivate a reluctant witness, or that disclosure of the statement would have had any effect on his credibility." *Id.* at 884. Therefore, we concluded that the State had made no promise, as contemplated by *Giglio.* Furthermore, assuming that the State had made a promise to Evans, we held that "there is no 'reasonable likelihood' that the State's failure to disclose the detective's cryptic statement ... affected the judgment of the jury," *id.* (quoting *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766); thus, the error was harmless. The evidence presented to the district court in the present case is no different from that reviewed in *McCleskey;* Depree has offered no additional evidence to prove his *Giglio* claim. We perceive no reason, then, why our conclusion here should differ from that reached by the en banc court in *McCleskey.* Accordingly, we affirm the district court's rejection of Depree's *Giglio* claim involving Evans.

■ Smith testified, in the district court, that Harris and Parker told him that they would take care of him; he stated, however, that they promised him nothing. Depree argues that Smith's testimony suggests that either Harris or Parker, or both, promised to help Smith in return for his testimony; specifically, Depree gleans from Smith's testimony that either Harris

**21.** Even if Smith did learn more information, its incremental value to the State, compared with the information Smith reported on November 13, would likely render any *Massiah* violation harmless.

or Parker promised somehow to alter the sentences Smith received for his most recent crimes (escape and automobile theft) so that they would run concurrently with those he was serving at the time of his escape. Both Harris and Parker denied making any promises to Smith; in particular, Parker noted that under Georgia law, Smith's sentences were unalterable [22]—the term of court during which Smith had been convicted and sentenced had passed by the time Smith testified against Depree.

The district court, after weighing the evidence, concluded that "the marginal statements purportedly made by Detective Harris and Mr. Parker were not of such a nature that, under the circumstances of this case, they had to be disclosed to defense counsel at Depree's trial.... [T]his court holds that no promises were made to Smith that were required to be disclosed to Depree under *Giglio*." We agree. By his own admission, Smith did not believe the State had promised him anything. While it is fair to assume, as the district court did, that Smith, like most informants, hoped his cooperation would result in more favorable treatment, this fact does not convert ambiguous statements by the State into promises that Smith would, in fact, receive more favorable treatment. The record simply does not demonstrate that the district court's finding was clearly erroneous. We, therefore, affirm the district court's decision on the *Giglio* claim involving Smith.

### IV.

For the foregoing reasons, we AFFIRM the district court's dismissal of Depree's petition for writ of habeas corpus.

IT IS SO ORDERED.

---

**22.** They could be changed, of course, on appellate or collateral review.