

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-24-1999

# Matteo v. Supt SCI Albion

Precedential or Non-Precedential:

Docket 96-2115

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Matteo v. Supt SCI Albion" (1999). *1999 Decisions*. Paper 77.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/77

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed March 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-2115

ANTHONY N. MATTEO,
        Appellant

v.

SUPERINTENDENT, SCI ALBION;
THE DISTRICT ATTORNEY OF THE COUNTY OF
CHESTER; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 96-cv-06041
(Honorable Joseph L. McGlynn, Jr.)

Argued January 30, 1998
Before: MANSMANN, COWEN and RENDELL, Circuit Judges

Argued En Banc November 23, 1998
Before: BECKER, Chief Judge, SLOVITER, STAPLETON,
GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH, LEWIS,
McKEE, RENDELL and COWEN, Circuit Judges

(Filed March 24, 1999)

WALTER M. PHILLIPS, JR.,
 ESQUIRE (ARGUED)
Hoyle, Morris & Kerr
4900 One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103

 Attorney for Appellant

STUART SUSS, ESQUIRE (ARGUED)
NICHOLAS J. CASENTA, JR.,
 ESQUIRE
Office of District Attorney
17 North Church Street
Courthouse Annex – Second Floor
West Chester, Pennsylvania 19380

 Attorney for Appellees,
 The District Attorney of the
 County of Chester; The Attorney
 General of the Commonwealth of
 Pennsylvania

JAMES S. LIEBMAN, ESQUIRE
 (ARGUED)
Columbia University School of Law
435 West 116th Street
Box B-16
New York, New York 10027

2

MATTHEW C. LAWRY, ESQUIRE
Defender Association of Philadelphia
Federal Court Division
Lafayette Building, Suite 800
437 Chestnut Street
Philadelphia, Pennsylvania
 19106-2414

 Attorneys for Federal Defender
 Organization Amici Curiae
 Appellants, Richard Couglin, Esq.,
 Federal Public Defender, District of
 New Jersey; James V. Wade, Esq.,
 Federal Public Defender, Middle
 District of Pennsylvania; Shelley
 Stark, Esq., Federal Public
 Defender, Western District of
 Pennsylvania; Penny Marshall,
 Esq., Assistant Federal Public
 Defender, District of Delaware;
 and Maureen Kearney Rowley,
 Chief Federal Defender, Federal
 Court Division, Defender
 Association of Philadelphia

PETER J. GARDNER, ESQUIRE
 (ARGUED)
DONNA G. ZUCKER, ESQUIRE
Office of District Attorney
1421 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19102

 Attorneys for Amici Curiae
 Appellees, Attorney General, State
 of Delaware; Attorney General,
 State of New Jersey; Attorney
 General, Commonwealth of
 Pennsylvania; District Attorney,
 Allegheny County; and District
 Attorney, Philadelphia County

3

OPINION OF THE COURT

SCIRICA, Circuit Judge.

Like our sister courts of appeals, we are asked to
determine the appropriate standard of review governing
petitions for a writ of habeas corpus. Anthony Matteo seeks
habeas relief from his state convictions for first degree
murder, robbery, theft, and possession of marijuana,
contending the Commonwealth of Pennsylvania violated his
Sixth Amendment right to counsel by using incriminating
statements he made in two telephone conversations from
prison to an outside informant. In evaluating Matteo's
petition, the en banc court must interpret the standard of
review provision incorporated into 28 U.S.C. S 2254(d) by
the Antiterrorism and Effective Death Penalty Act of 1996
("AEDPA"), which revised the standard of review for habeas
corpus petitions. We hold that the revised statute mandates
a two-part inquiry: first, the federal court must inquire
whether the state court decision was "contrary to" clearly
established federal law, as determined by the Supreme
Court of the United States; second, if it was not, the federal
court must evaluate whether the state court judgment rests
upon an objectively unreasonable application of clearly
established Supreme Court jurisprudence. Applying this
analysis, we will affirm the District Court's dismissal of
Matteo's habeas petition.

I. Background

A. Facts

In September 1988, Anthony Matteo was convicted of
first degree murder, robbery, theft, and possession of
marijuana and subsequently sentenced to life
imprisonment on the murder conviction and twenty years'
consecutive probation on the robbery conviction. The facts
underlying Matteo's convictions were aptly summarized in
the opinion of the Court of Common Pleas of Chester
County, Pennsylvania:

4

On January 17, 1988, Patrick Calandriello was found dead in the trunk of his Cadillac which was parked in the North parking lot of the Holiday Inn in Lionville, Pennsylvania. Calandriello had been shot in the head with a .22 caliber rifle and stuffed in the trunk of his own car. Although Calandriello had been known to carry large sums of money, usually in large denominations, no money was found on him. Additionally, he was missing both his apartment and his car keys. Investigators also discovered white cat hairs on Calandriello's pants and a sneaker print on the rear bumper of his car.

The story which ended in Calandriello's death and Matteo's conviction commences in September 1987. Edward Beson, a friend of Calandriello's, testified that Calandriello sought Beson's assistance in storing $20,000 worth of stolen golf carts which Calandriello was soon to acquire. Beson learned from Calandriello that Anthony Matteo was going to obtain these stolen golf carts for Calandriello.

Apparently, the first of two "attempts" to obtain the stolen golf carts, in September of 1987 and January 5, 1988, was unsuccessful. At approximately 11:20 a.m. on January 13, 1988, Calandriello telephoned Beson and stated that he was going to pick up Anthony Matteo at Matteo's house and that he, Calandriello, would be carrying $5,000 or $6,000. Another $15,000 was to be left in the care of Calandriello's friend Richard Ross. Calandriello told Beson that he would meet Beson at 2:00 p.m. that afternoon at Denny's Restaurant, but Calandriello never arrived.

Shortly after noon on January 13, 1998, Calandriello did indeed leave $15,000 in an envelope with Richard Ross at a Roy Rogers Restaurant in Paoli. Calandriello told Ross that he was going to Routes 401 and 113 to pick someone up and that he would return in approximately forty-five minutes to an hour; Matteo's home is nearby this intersection. Ross awaited Calandriello's return for over three hours before he gave up and left the Roy Rogers Restaurant.

Sara Kessock, Calandriello's girlfriend, reported Calandriello missing and an investigation of his disappearance ensued. Eventually, the investigation led to Anthony Matteo, and the police conducted two searches of the Matteo home. The searches revealed the following:

1. In Defendant's room was .22 ammo consistent with the type that killed Calandriello;

2. In Defendant's room were sets of Calandriel lo's car and apartment keys;

3. Under the mattress in Defendant's brother's room was $1,200 in $100 bills;

4. At the Matteo house was a white cat whose h air was consistent with the hairs found on Calandriello's pants;

5. In Defendant's room were sneakers that an F BI expert was "90% to 95% certain" were the sneakers that made the print on Calandriello's car's rear bumper; and

6. Blood was found in the defendant's garage t hat was consistent with Calandriello's and only 3% of the rest of the population.

Crucial testimony was provided by a number of Matteo's friends. First, Timothy Flynn stated that he and the Defendant had gone target shooting on January 10, 1988. Flynn also stated that on the evening of January 13, 1988, the Defendant was carrying a wad of bills and was spending $100 bills.

Next, C. John Stanchina, a longtime friend of the Defendant's, testified that at approximately 2:25 p.m. on January 13, 1988, he picked up the Defendant at the North end parking lot of the Holiday Inn in Lionville. As it would turn out, this was near where Calandriello's frozen body was later discovered.

Finally, Douglas Lubking testified that he had lent the Defendant a .22 rifle in December of 1987. Lubking and the Defendant had been target shooting and Defendant asked Lubking to loan Defendant the rifle so

6

he could practice. Subsequent to his arrest for murder, the Defendant called Lubking from the Chester County Prison. The Defendant told Lubking that he had hidden Lubking's rifle near the Defendant's home. Defendant asked Lubking to retrieve the .22 rifle and to hide it in Lubking's attic. Defendant also instructed Lubking to tell the police and Defendant's own attorneys that Lubking did not own a .22 rifle. As a bribe, Defendant offered $1,500 worth of cocaine if he would retrieve the gun. As a result of Defendant's instructions, the gun was located by the police on February 1, 1988. It was this same gun which was later identified by Timothy Flynn as the gun with which Defendant had been target shooting on January 10, 1988. This gun was found to be consistent with the type of gun that killed Calandriello.

Commonwealth v. Matteo, No. 419-88, mem. op. at 1-4 (Pa. C.C.P. Mar. 19, 1990).

Of particular importance in this appeal are the telephone conversations between Matteo and Lubking that took place after Matteo's arrest. The evidence in the record shows that on January 28, 1988, Matteo called Lubking from prison and asked him to retrieve the rifle that Matteo had borrowed from Lubking shortly before Calandriello's murder. Matteo told Lubking that he had nothing to do with Patrick Calandriello's murder, but that he had hidden the rifle so that Lubking would not become a suspect. Lubking responded that he wanted to consult with an attorney before deciding what to do. He told Matteo to call him back the following evening at 8:30 p.m.

The next morning, January 29, 1988, Lubking met with an attorney, who advised him to inform the Chester County District Attorney's office of his conversation with Matteo. Lubking did so, meeting with Chester County detectives that afternoon. During that meeting, Lubking provided written consent to let police intercept and record the anticipated phone call from Matteo that night. The detectives instructed Lubking that he was not to ask questions or otherwise elicit information from Matteo.

As expected, Matteo called Lubking around 8:30 that evening. The police recorded the conversation. At trial,

7

Lubking identified the recorded voices as his and Matteo's. The conversation, which need not be reproduced in full here, consists mainly of Matteo instructing Lubking on how to retrieve the rifle as Lubking provides brief acknowledgments of understanding:

> MATTEO: I got rid of that [the rifle], and  I put it outside. Any damage that the weather has done to it, I will replace. Okay?
>
> LUBKING: Okay.
>
> MATTEO: If it has. So I just don't want you gettin g nervous too. So if anybody asks, you don't have a .22 and you didn't -- eh-eh, what do you call. All right?
>
> LUBKING: Uh-huh.
>
> * * * * *
>
> MATTEO: Ahm -- ah -- when are you able to go g et it, from when I tell you to get it.
>
> LUBKING: As soon as possible. I want this thing-- I want it here.
>
> MATTEO: Can you leave right now to get it?
>
> LUBKING: Yeah.
>
> MATTEO: Okay. Now I'm going to tell you where it's  at, but you got to leave this instant to get it . . . . And once you get it, clean it up and just like, you know, put it away in your attic or something.

Matteo then suggested that Lubking fabricate a pretense to drop something off at Matteo's house, so that Lubking could retrieve the rifle while there. At this point in the conversation, Lubking's extremely brief responses-- he had been instructed not to elicit information -- aroused Matteo's suspicion:

> MATTEO: What's the matter? Why do you seem so hesitant?
>
> LUBKING: No. I'm not hesitant. I'm just --
>
> MATTEO: You just make me nervous.
>
> LUBKING: Sorry.

8

        * * *

        MATTEO: What's the matter?

        LUBKING: Nothing.

        MATTEO: You're sure?

        LUBKING: I'm positive.

        MATTEO: I don't want to be getting set up here too.

        LUBKING: No. Don't worry about it.

        MATTEO: I'm worrying about it. Okay?

        LUBKING: Okay. Yeah. I want this -- I don't-- I want
        this out of the way.

        MATTEO: Okay.

        LUBKING: That's why I'm nervous. I just want it ou t of
        the way.

His fears allayed, Matteo proceeded to give Lubking detailed
instructions on how to find the rifle, which was buried
under the snow in Matteo's back yard.

        MATTEO: Okay. I'm gonna do it. Are you ready?

        LUBKING: Uh-huh.

        MATTEO: Go in my driveway. Okay. You know how
        you go down a dirt road and you come to that little tiny
        bridge?

        LUBKING: Uh-huh.

        MATTEO: All right. Well, you stop your car and tur n
        your lights off, leave your car running.

        LUBKING: Uh-huh.

        * * * *

        MATTEO: You go onto the right-hand side of the roa d,
        the passenger side of the road, and you go down. And
        on the side of the right, on the side, there's like a
        cement wall going down into the water.

        LUBKING: Uh-huh.

MATTEO: Right next to the cement wall is where it's at, but you got to dig through the snow to get to it.

LUBKING: Okay.

MATTEO: You get out of the car. You go around the front of the car with your lights off and you go to the railing.

LUBKING: The driver's side?

MATTEO: By the passenger's side.

LUBKING: Uh, okay.

MATTEO: You gotta go around the front of the car if you're facing forward.

LUBKING: Uh-huh.

MATTEO: Okay. Go around the -- go down the, you know, it's like a steep little incline, an incline going down.

LUBKING: Yeah.

MATTEO: Right on that incline there's like a little cement wall, I believe. And it's right next to that. And it's under the snow, so you gotta, you know, bury it. And make sure nobody sees you do it. Okay? Open the trunk. Throw it in the trunk. Okay. Don't put it in the back of your car. Throw it in the trunk. I don't care how wet it is, through it in the trunk. And then leave, then go put it in your attic. All right? So then nobody will bother you.

LUBKING: All right.

MATTEO: And if anybody asks, you know, you don't have one. Now, when can you do this?

LUBKING: Right now.

The two agreed that Matteo would call Lubking again at 10:00 p.m.

After the conversation ended, police went to Matteo's house with Lubking and searched the backyard for the rifle. Despite Matteo's instructions, however, they were unable to find it. The police and Lubking then returned to Lubking's

10

home and awaited Matteo's call. It appears the police gave Lubking no further instructions at this time. As arranged, Matteo called Lubking again at 10:00 p.m. and police recorded the call:

      LUBKING: Yeah?

      MATTEO: It's Anthony. What's up?

      LUBKING: I couldn't find it. You oughta get-- I need more explicit -- this is --

      MATTEO: What did you say?

      LUBKING: I could not find it.

      MATTEO: What do you mean you couldn't find it?

      LUBKING: Well, you said the bridge.

      MATTEO: Yeah.

      LUBKING: And there's two bridges there. There's a sewer pipe and there's --

      MATTEO: You got to speak up. I can hardly hear you.

      LUBKING: There's a sewer pipe.

      MATTEO: A big -- real, real huge one?

      LUBKING: Yeah.

      MATTEO: Yeah. It goes under that cement bridge.

      LUBKING: Yeah. On the far side, on the -- all th e way closer to your house?

      MATTEO: Okay. You're talking -- I'm talking-- you drive on the road, right, you're driving on the road.

      LUBKING: Right.

      MATTEO: And you come to the cement bridge with the two railings on either side.

      LUBKING: Pardon me?

      MATTEO: Is there two railings on either side?

      LUBKING: Yeah.

MATTEO: All right.

11

        LUBKING: That's -- that's a stone bridge.

        MATTEO: Yeah. That's what I'm talking about.

        LUBKING: Oh, okay.

The conversation continued in this vein, as Matteo attempted to explain exactly where he had hidden the rifle and Lubking asked various clarifying questions. The two agreed to speak again later that night or the next evening. After the conversation, police returned to Matteo's property -- this time without Lubking -- and successfully located the rifle. Both the rifle and the recorded conversations were admitted into evidence at Matteo's trial.

B. Procedural History

As noted, following a jury trial in the Chester County Court of Commons Pleas, Matteo was convicted of all charges and sentenced accordingly. The Superior Court of Pennsylvania affirmed his convictions, see Commonwealth v. Matteo, 589 A.2d 1175 (Pa. Super. Ct. 1991), and the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal, see Commonwealth v. Matteo, 604 A.2d 1030 (Pa. 1992), and Petition for Reconsideration.

On November 30, 1994, Matteo filed a petition for habeas corpus relief in United States District Court for the Eastern District of Pennsylvania. The District Court adopted the Magistrate Judge's recommendation that Matteo's petition be dismissed unless Matteo withdrew two unexhausted claims. After Matteo declined to do so, the District Court dismissed the petition and later denied Matteo's request for reinstatement of the petition.

In September 1996, Matteo's new counsel filed another petition for habeas relief, alleging that his Sixth Amendment right to counsel had been violated by the wiretapping of his two telephone conversations with Lubking. The Magistrate Judge recommended that his petition be denied on the grounds that Matteo's right to counsel had not attached at the time of the telephone calls. The District Court dismissed the petition, but on different grounds, holding that under Massiah v. United States, 377 U.S. 201 (1964), Lubking had not acted as a government agent and the police had not deliberately elicited

                            12

incriminating information from Matteo. See Matteo v. Superintendent, No. 96-6041, mem. op. at 10 (E.D. Pa. Nov. 25, 1996). We granted Matteo's request for a certificate of appealability; following oral argument before a panel but prior to the issuance of an opinion, the case was listed for rehearing en banc pursuant to Rule 9.4.1 of our Internal Operating Procedure. See Matteo v. Superintendent, 144 F.3d 882 (3d Cir. 1998).

II. Interpretation of AEDPA

Matteo's argument on appeal is that his Sixth Amendment right to counsel was violated by the state's elicitation of the location of the rifle. Before addressing the merits, however, we must determine the appropriate standard of review. Specifically, we must discern the meaning of 28 U.S.C. S 2254(d) (West Supp. 1998) as amended by the Antiterrorisim and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214. The amended section provides, in part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of that claim--
>
> (1) resulted in a decision that was contrary t o, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on a n unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. S 2254(d) (West Supp. 1998). The proper interpretation of this language has been the subject of much debate, engendering at least three distinct approaches among the federal courts of appeals. The crux of the debate has been what degree of deference, if any, AEDPA requires a federal habeas court to accord a state court's construction of federal constitutional issues and

13

interpretation of Supreme Court precedent. Previously, federal habeas courts were not required to "pay any special heed to the underlying state court decision." O'Brien v. Dubois, 145 F.3d 16, 20 (1st Cir. 1998) (citing Brown v. Allen, 344 U.S. 443, 458 (1953)). That is no longer the case -- the text of section 2254(d) firmly establishes the state court decision as the starting point in habeas review. But the precise extent of the changes wrought by AEDPA remains to be determined. Because this is a matter of first impression in our court of appeals, we begin by examining how other courts have interpreted the provisions at issue.

A. Approaches of Other Circuits

In O'Brien, the Court of Appeals for the First Circuit held that AEDPA does not require uniform deference to state court decisions but "restricts the armamentarium of legal rules available to a federal habeas court in evaluating a state court judgment" by "confin[ing] the set of relevant rules to those `clearly established by the Supreme Court.' " 145 F.3d at 23. As such, the First Circuit held, AEDPA did not codify the Supreme Court's decision in Teague v. Lane, 489 U.S. 288 (1989), but "embrace[d] one of its primary goals," namely, preventing federal habeas courts from requiring state courts to act as "innovators in the field of criminal procedure." O'Brien, 145 F.3d at 23. Accordingly, the O'Brien approach interprets AEDPA to require a two-step inquiry. First, under section 2254(d)(1) the federal habeas court "asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is `contrary to' the governing rule." Id. at 24. Under this formulation, "contrary to" analysis applies only if the Supreme Court has articulated a rule that governs the claim, though factual identity is not required:

> [A]n affirmative answer to the first section 2254(d)(1) inquiry -- whether the Supreme Court has prescribed a rule that governs the petitioner's claim -- requires something more than a recognition that the Supreme Court has articulated a general standard that covers the claim. To obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent

14

requires an outcome contrary to that reached by the relevant state court.

 We caution that this criterion should not be applied in too rigid a manner. A petitioner need not point a habeas court to a factually identical precedent. Oftentimes, Supreme Court holdings are "general" in the sense that they erect a framework specifically intended for application to variant factual situations. These rules sufficiently shape the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision under section 2254(d)(1)'s "contrary to" prong.

Id. at 24-25 (citations omitted).

The second step of the O'Brien approach is necessary only if no Supreme Court rule governs the petitioner's claim. Then, the federal habeas court is required to determine whether the state court decision involved an "unreasonable application of" clearly established federal law, as determined by the Supreme Court. See id. at 24. The writ of habeas corpus should be granted only if the state court decision was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." Id. at 25 (citing Hall v. Washington, 106 F.3d 742, 748-49 (7th Cir. 1997)). Applying this analysis, the O'Brien court upheld the state court's decision that the scope of recross examination had not violated the petitioner's Sixth Amendment rights. See O'Brien, 145 F.3d at 27.

A different analysis was propounded by the Court of Appeals for the Fourth Circuit in Green v. French, 143 F.3d 865 (4th Cir. 1998). The Green court held that a decision is "contrary to" Supreme Court precedent when"either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue." Id. at 870. The court further explicated the meaning of "contrary to" as follows:

15

A lower court's decision . . . certainly is said to be "contrary to" supreme court precedent when, through the resolution of a question of pure law, that decision reaches a legal conclusion or a result opposite to that reached in a supreme court opinion which addresses the identical question of law. A lower court's decision is likewise "contrary to" a higher court's precedent when that decision correctly identifies the governing legal principle from the precedent but applies that principle to facts that are indistinguishable in any material respect from those on the basis of which the precedent was decided in such a way as to reach a conclusion different from that reached by the higher court. It is also common to characterize a lower court decision as "contrary to" supreme court precedent when that decision applies a precedent in a factual context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is indisputably unjustified, or, conversely, when that decision fails to apply a precedent in a different context to which the precedent's principle clearly does apply.

Id. at 869.

Under Green, "unreasonable application of " Supreme Court precedent occurs when the state court decision

applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability).

Id. at 870; see also Davis v. Kramer, 167 F.3d 494, 500 & n.8 (9th Cir. 1999) (employing a similar analysis). Thus, under this approach "unreasonable application of" clearly

16

established Supreme Court encompasses three distinct scenarios: (1) the state court extends Supreme Court precedent to cover a new factual context in which application of the precedent is unreasonable; (2) the state court unreasonably fails to apply a precedent in a factual context that warrants its application; or (3) the state court applies the correct precedent, but unreasonably in light of the facts of the case before it. Of course, all three scenarios require a definition of "unreasonable"; in the Fourth Circuit's view, the habeas court must inquire whether "the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is reasonable." Id.

Yet a third distinct approach has been espoused by the Courts of Appeals for the Fifth, Seventh, and Eleventh Circuits, which interpret AEDPA to require a distinction between pure questions of law, which are reviewed de novo, and mixed questions of law and fact, which receive more deferential treatment. See Neelley v. Nagle, 138 F.3d 917, 924 (11th Cir. 1998); Drinkard, 97 F.3d at 768; Lindh v. Murphy, 96 F.3d 856, 870 (7th Cir. 1996) (en banc), rev'd on other grounds, 521 U.S. 320 (1997).1 As explained by the Fifth Circuit in Drinkard, this approach is premised on the view that courts resolve three types of questions: questions of law, questions of fact, and mixed questions of law and fact. See 97 F.3d at 767. Section 2254(d)(2) appears to apply solely to questions of fact: it allows habeas relief where the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. S 2254(d)(2) (West Supp. 1998). Thus, as these courts read it, section 2254(d)(1) must cover questions of law and mixed questions of law and fact. These courts interpret the "contrary to law" provision as governing questions of pure law and the "unreasonable application of " provision as applying to mixed questions of law and fact. Accordingly, they apply de novo review to questions of

_____

1. The Seventh Circuit developed the bifurcated approach in Lindh, but more recently appears to have abandoned it. See Hall v. Washington, 106 F.3d 742, 748 (7th Cir. 1997); see also O'Brien, 145 F.3d at 21 n.4 (noting the discrepancy between Lindh and Hall).

17

pure law, which fall within the "contrary to" clause, and a more deferential standard to mixed questions falling within the "unreasonable application of" clause.

B. Analysis

As several courts have recognized, the text of AEDPA offers little guidance to the courts charged with applying it. See Lindh v. Murphy, 521 U.S. 320, 336 (1997) ("[I]n a world of silk purses and pigs' ears, [AEDPA] is not a silk purse of the art of statutory drafting."); O'Brien, 145 F.3d at 20 (noting that AEDPA is "hardly a model of clarity . . . and its standard of review provision is far from self-explicating"). Nevertheless, we must begin our analysis with the words of the statute. See, e.g., Bailey v. United States, 516 U.S. 137, 144 (1995). Section 2254(d) states that applications for habeas corpus relief "shall not be granted" unless one of the conditions set forth in subsections (d)(1) and (d)(2) is met. 28 U.S.C. S 2254(d) (West Supp. 1998). These conditions, as demarcated by AEDPA, are twofold:first, habeas corpus relief is warranted when the state adjudication resulted in a decision that was "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the Supreme Court, see id. S 2254(d)(1); second, relief is warranted when the state adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence." Id. S 2254(d)(2). Only the first -- section 2254(d)(1) -- is at issue in this appeal.

Consequently, our task is to discern the meaning of the phrases "contrary to" and "unreasonable application of " as used in AEDPA. The two may overlap, but we must attempt to read the statute so that each has some operative effect, see United States v. Nordic Village, Inc., 503 U.S. 30, 36 (1992), and we must assume the legislative purpose "is expressed by the ordinary meaning of the words used," Richards v. United States, 369 U.S. 1, 9 (1962); see also Green, 143 F.3d at 870 ("[A]ccording each term its most natural (even if not its only) meaning, results in an interpretation of [AEDPA] most faithful to the plain purpose of the statute.").

As noted, the Fourth Circuit's interpretation of AEDPA attempts to catalogue the situations in which a result might

18

be "contrary to" or an "unreasonable application of" a higher court's precedent. See 143 F.3d at 869-70. The Green court held that a decision is "contrary to" precedent when "either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue." Id. at 870. The court also held that a decision constitutes an "unreasonable application of" the relevant law when it unjustifiably extends the precedent's legal principle to a new context, fails to apply the principle in a context where such failure is "unreasonable," or identifies the correct principle but unreasonably applies it to the facts before it (assuming those facts are not so different as to"constitute a new context for consideration of the principle's applicability"). Id. Although we find this analysis insightful, we decline to adopt it as the basis for scrutinizing state court judgments under AEDPA. We believe that in practice, it will be difficult for a court to determine which, if any, of the foregoing scenarios is implicated in the case before it. In our view, a better analytical framework is provided by the First Circuit in O'Brien, which directs federal habeas courts first to identify whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review; and second, only if it has not, to evaluate whether the state court unreasonably applied the relevant body of precedent. See 145 F.3d at 24-25.

Consequently, we hold that the "contrary to" provision of AEDPA requires a federal habeas court first to identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. Like the First Circuit, we believe this analysis requires "something more than a recognition that the Supreme Court has articulated a general standard that covers the claim." Id. at 24. Instead, the inquiry must be whether the Supreme Court has established a rule that determines the outcome of the petition. Accordingly, we adopt O'Brien's holding that "[t]o obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." Id. at

19

24-25. In other words, it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome. This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent.

We also emphasize that it is not necessary for the petitioner to cite factually identical Supreme Court precedent. Rather, the critical question is "whether a Supreme Court rule -- by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations -- can fairly be said to require a particular result in a particular case." Id. at 25.

If the federal habeas court determines that the state court decision was not "contrary to" the applicable body of Supreme Court law -- either because the state court decision complies with the Supreme Court rule governing the claim, or because no such rule has been established -- then the federal habeas court should undertake the second step of analyzing whether the decision was based on an "unreasonable application of " Supreme Court precedent. We agree with the First Circuit's observation that"the `unreasonable application' clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result." O'Brien, 145 F.3d at 25; see also Neelley, 138 F.3d at 924 ("[T]he mere fact that a district court disagrees with a state court does not render that state court's decision `unreasonable'; certainly two courts can differ over the proper resolution of a close question without either viewpoint being unreasonable."); Hennon v. Cooper, 109 F.3d 330, 334 (7th Cir. 1997) ("[T]he fact that we might disagree with the state court's determination . . . would not carry the day."). To hold otherwise would resemble de novo review, which we believe is proscribed by the statute. But we depart from the First Circuit in our understanding of what constitutes an

20

"unreasonable application" of clearly established federal law. As noted, O'Brien holds that a state court's application of law is unreasonable only if it is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." 145 F.3d at 25. This definition seemingly would exclude all but the most implausible of holdings. As a practical matter, we believe its effect would be to render the "unreasonable application" clause a virtual nullity, as granting habeas relief would require an explicit finding that the state court decision -- often, a decision of the state's highest court -- was so far off the mark as to suggest judicial incompetence.

We find the same flaw in the standard espoused by the Fourth and Fifth Circuits. As noted, their approach inquires whether a reasonable jurist could reach the result in question. See Green, 143 F.3d at 870 ("[H]abeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable."); Drinkard, 97 F.3d at 769 ("[A]n application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was correct. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.") We believe a "no reasonable jurist" definition unduly discourages the granting of relief insofar as it requires the federal habeas court to hold that the state court judges acted in a way that no reasonable jurists would under the circumstances. As such, it has the tendency to focus attention on the reasonableness of the jurists rather than the merits of the decision itself. For example, in Drinkard one member of the panel dissented from the majority's interpretation of the petitioner's constitutional claim; the court expressly relied on this disagreement as the basis for concluding that the state court's application of the law was not unreasonable. See 97 F.3d at 769.

We do not believe AEDPA requires such unanimity of opinion. Nor do we think it entails an examination of

21

whether the jurists responsible for the state court decision are reasonable: such an approach, like that of O'Brien, would doubtless lead to the denial of virtually all petitions. Rather, we hold the appropriate question is whether the state court's application of Supreme Court precedent was objectively unreasonable. The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. In making this determination, mere disagreement with the state court's conclusions is not enough to warrant habeas relief. Furthermore, although AEDPA refers to "clearly established Federal law, `as determined by the Supreme Court of the United States,' " 28 U.S.C. S 2254(d)(1) (West Supp. 1998), we do not believe federal habeas courts are precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable. See O'Brien, 145 F.3d at 25 ("To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue."). Instead, the primary significance of the phrase "as determined by the Supreme Court of the United States" is that federal courts may not grant habeas corpus relief based on the state court's failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed. Thus, in certain cases it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent.

We believe this interpretation is supported by AEDPA's legislative history, which indicates Congress sought to preserve independent review of federal constitutional claims, but to curtail its scope by mandating deference to reasonable state court decisions. Explaining the "unreasonable application" provision, Senator Hatch, the bill's primary sponsor, stated:

> What does this mean? It means that if the State court reasonably applied Federal law, its decision must be upheld. Why is that a problematic standard? After all,

22

> Federal habeas review exists to correct fundamental
> defects in the law. If the State court decision has
> reasonably applied Federal law it is hard to say that a
> fundamental defect exists.

141 Cong. Rec. S7848 (daily ed. June 7, 1995) (statement of Sen. Hatch). Another of the bill's sponsors, Senator Specter, observed that "under the bill deference will be owed to State courts' decisions on the application of Federal law to the facts. Unless it is unreasonable, a State court's decision applying the law to the facts will be upheld." 142 Cong. Rec. S3472 (daily ed. Apr. 17, 1996) (statement of Sen. Specter). These and other statements from the legislative history persuade us that Congress intended to restrict habeas relief to cases in which the state court judgment rested upon an objectively flawed interpretation of Supreme Court precedent. See also H.R. Conf. Rep. No. 104-518, at 111 (1996) (stating that AEDPA "requires deference to the determinations of state courts that are neither `contrary to,' nor an `unreasonable application of,' clearly established federal law"). As one commentator accurately recounts, in both houses of Congress section 2254(d) "was called a `deference' standard by every member who spoke on the question, opponents as well as supporters." Kent S. Scheidegger, Habeas Corpus, Relitigation, and the Legislative Power, 98 Colum. L. Rev. 888, 945 (1998).

Regarding the objective nature of the standard, we believe our reading comports with pre-AEDPA law in this area, which was governed primarily by Teague v. Lane, 489 U.S. 288 (1989). There, the Supreme Court held that a federal court cannot grant habeas relief to a petitioner based on a rule announced after his conviction and sentence became final. See id. at 311. The Supreme Court has repeatedly recognized that "the Teague doctrine`validates reasonable, good-faith interpretations of existing precedents made by state courts . . . . .' " O'Dell v. Netherland, 521 U.S. 151, 156 (1997) (quoting Butler v. McKellar, 494 U.S. 407, 414 (1990)).[2]

_____

2. Although the Teague doctrine was supplemented by the passage of AEDPA, Teague continues to be applied in its own right. See, e.g., Breard v. Greene, 523 U.S. 371 (1998) (applying Teague to a post-AEDPA habeas petition).

The test of reasonableness in this context is objective, not subjective: "Reasonableness, in this as in many other contexts, is an objective standard." O'Dell , 521 U.S. at 156 (quoting Stringer v. Black, 503 U.S. 222, 237 (1992)).

Of course, we recognize that an "objective unreasonableness" test will fail to dictate an obvious result in many cases. But we believe the same would be true under any faithful reading of the statute. Notions of reasonableness abound in the law and are not ordinarily considered problematic, despite their imprecision. See Bell v. Wolfish, 441 U.S. 520, 559 (1979) (observing, in the Fourth Amendment context, that "the test of reasonableness . . . is not capable of precise definition or mechanical application"), quoted in Graham v. Connor, 490 U.S. 386, 396 (1989). As the Seventh Circuit recently observed, the "unreasonable application of " standard admits of no a fortiori definition: "None of this answers the question when a departure is so great as to be `unreasonable,' for that questions lacks an abstract answer . . . . Questions of degree -- like questions about the proper use of `discretion' -- lack answers to which the labels `right' and `wrong' may be attached." Lindh, 96 F.3d at 871. Thus, the imprecision of the "objective unreasonableness" test does not pose an insurmountable obstacle; indeed, we believe it is the intended result of the statutory language.

To summarize, we adopt the First Circuit's view that section 2254(d)(1) requires a two-step analysis. First, the federal habeas court must determine whether the state court decision was "contrary to" Supreme Court precedent that governs the petitioner's claim. Relief is appropriate only if the petitioner shows that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." O'Brien, 145 F.3d at 24-25. In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an "unreasonable application of" Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted.

24

With this analytical framework in place, we turn to the merits of Matteo's petition.

III. Matteo's Sixth Amendment Claim

Matteo's sole argument on the merits is that the taping, and subsequent use in evidence, of his two telephone conversations with Lubking deprived him of his right to counsel as secured by the Sixth and Fourteenth Amendments to the United States Constitution. The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Relying on Massiah v. United States , 377 U.S. 201 (1964) and its progeny, Matteo claims the Pennsylvania Superior Court's rejection of his Sixth Amendment argument was both "contrary to" and an "unreasonable application of " relevant Supreme Court precedent.

In Massiah, the Supreme Court held that deliberate elicitation of incriminating statements by a government agent, outside the presence of a charged defendant's attorney, violates the Sixth Amendment. Federal agents had secured the cooperation of an informant who agreed to let the agents place a radio transmitter underneath the seat of his car. An agent then overheard a conversation between Massiah and the informant, in which Massiah made several incriminating remarks about his drug importation activities. At trial, the agent was permitted to testify as to what he overheard on the radio transmitter, and Massiah was convicted. The Supreme Court overturned his conviction, holding that "the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206. In a subsequent line of cases, the Court developed the Massiah doctrine governing the constitutionality of these so-called "secret interrogations." The cases establish three basic requirements for finding a Sixth Amendment violation: (1) the right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been

25

acting as a "government agent"; and (3) the informant must have engaged in "deliberate elicitation" of incriminating information from the defendant. See, e.g., Maine v. Moulton, 474 U.S. 159, 170-71 (1985); United States v. Henry, 447 U.S. 264, 269-270 (1980). We will review each separately to determine whether the state court's conclusion withstands scrutiny under AEDPA.

A. Attachment of the Right to Counsel

The Pennsylvania Superior Court did not explicitly address whether Matteo's right to counsel had attached at the time in question. It did, however, analyze whether Lubking acted as a government agent and deliberately elicited information from Matteo. Because such an analysis would be unnecessary if Matteo's right to counsel had not attached, we believe the state court implicitly concluded that it had.

Generally, the Sixth Amendment right to counsel attaches "only at or after the initiation of adversary judicial proceedings against the defendant." United States v. Gouveia, 467 U.S. 180, 187 (1984); see also Estelle v. Smith, 451 U.S. 454, 469-70 (1981); Moore v. Illinois 434 U.S. 220, 226 (1977); Brewer v. Williams, 430 U.S. 387, 398 (1977); Kirby v. Illinois, 406 U.S. 682, 688 (1972). Such proceedings include "formal charge, preliminary hearing, indictment, information, or arraignment." Kirby, 406 U.S. at 689. The right also may attach at earlier stages, when "the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both, in a situation where the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality." Gouveia, 467 U.S. at 189 (citations omitted). The crucial point is that the defendant is guaranteed the protection of counsel from the moment he "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Kirby, 406 U.S. at 689.

At the time of Matteo's two telephone conversations, which took place on January 29-30, 1988, Matteo had been arrested and incarcerated for over a week. He had retained a lawyer, who ultimately represented him through the trial.

26

Matteo's preliminary hearing took place on February 12, 1988; the district attorney filed an information on March 3, 1988; and the arraignment was held on March 4, 1988. Citing these facts, the Magistrate Judge recommended denial of Matteo's petition on the grounds that his right to counsel had not yet attached. The District Court held otherwise, ruling that the right to counsel had attached but denying the petition on other grounds. See Matteo, mem. op. at 3.

We hold that Matteo's right to counsel had attached at the time of the telephone conversations. By this time Matteo had undergone preliminary arraignment. Additionally, he "was in custody as a result of an arrest warrant charging him with the murder, and he was, in fact, represented by counsel from the day he surrendered." Id. at 2-3. Moreover, both before and after the telephone calls, Matteo was confronted with the organized resources of an ongoing police investigation by agents who were well aware of his legal representation. Under these circumstances, we believe Matteo's right to counsel had attached and he was entitled to the full protection of the Sixth Amendment.

B. Lubking's Status as a Government Agent

The state court concluded that Lubking did not act as a government agent at the time of his two telephone conversations with Matteo. Applying our AEDPA analysis, we first determine whether the Supreme Court has established a rule that governs Matteo's claim. The Supreme Court has not formally defined the term "government agent" for Sixth Amendment purposes. See Depree v. Thomas, 946 F.2d 784, 793-94 (11th Cir. 1991) ("There is, by necessity, no brightline rule for determining whether an individual is a government agent for purposes of the Sixth Amendment right to counsel."). In its sole case focusing on a determination of government agency, the Supreme Court found the informant was an agent because he was paid and "acting under instructions" from the government. See Henry, 447 U.S. at 270. The Court also cited facts that the informant was ostensibly a mere fellow inmate rather than a trusted friend of the defendant and that the defendant was in custody and under indictment at the time of the alleged elicitation. The Court did not

27

attempt to generalize these factors into a rule defining government agency for future cases, nor has it revisited them in subsequent cases. Consequently, although our analysis is informed by the facts emphasized in Henry, we do not believe the Supreme Court has announced a rule of sufficient specificity to merit "contrary to" review. Cf. O'Brien, 145 F.3d at 24 ("[T]he chief question is how specific a rule must be to qualify as dispositive, thus triggering review under the `contrary to' clause.").

We next focus on whether the state court decision was based upon an objectively unreasonable application of existing law. The lower federal courts have explicated the holding of Henry in some detail: in particular, several have held that the existence of an express or implied agreement between the state and the informant is an additional factor supporting a finding of agency: "At a minimum .. . there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." Depree, 946 F.2d at 794; see also United States v. Taylor , 800 F.2d 1012, 1016 (10th Cir. 1986); Thomas v. Cox, 708 F.2d 132, 137 (4th Cir. 1983); United States v. Metcalfe, 698 F.2d 877, 882 (7th Cir. 1983); United States v. Calder, 641 F.2d 76, 79 (2d Cir. 1981). Applying this line of cases, the Pennsylvania Superior Court determined that Lubking was not an agent because " `there was no agreement or prior arrangement between Lubking and the District Attorney or the police; Lubking did not receive any compensation for the information he provided; he had no history of acting as a paid informant; and Lubking went to the police of his own volition after he had initially been contacted by the Defendant on January 28, 1988.' " Commonwealth v. Matteo, No. 01158, mem. op. at 10 (Pa. Super. Ct. Feb. 12, 1991) (quoting trial court opinion).

Matteo disputes this conclusion on several grounds. First, he contends the state court erred in finding that Lubking received no compensation or benefit for his aid to the police. Although it is agreed that Lubking received no monetary compensation, Matteo argues Lubking's decision to cooperate with authorities was motivated by his desire not to become a suspect in the investigation of

28

Calandriello's murder. As such, Matteo claims, the arrangement between Lubking and the police amounted to a "quid pro quo" exchange in which the police agreed not to investigate Lubking in return for his cooperation. Such a quid pro quo -- in which the informant receives some type of benefit, even if nonpecuniary, in exchange for assisting the authorities -- may constitute evidence of an agency relationship. See United States v. Brink, 39 F.3d 419, 423 n.5 (3d Cir. 1994) ("[W]e believe the Court meant that any informant who is offered money, benefits, preferential treatment, or some future consideration, including, but not limited to, a reduction in sentence, in exchange for eliciting information is a paid informant."). As noted, Matteo contends that Lubking cooperated in order to prevent himself from becoming a suspect in the investigation. Whatever Lubking's motivation, the record amply supports the state court's determination that no deal was struck between Lubking and the police. Lubking himself testified as follows:

> Q. Now, prior to these calls, did the police make any threats to you?
>
> A. No.
>
> Q. Any promises?
>
> A. Nope.
>
> Q. Did you have any deal with them?
>
> A. No.
>
> Q. Were you paid for cooperating with the police?
>
> A. No.
>
> Q. What if any benefit did you receive [for] helping them?
>
> A. None.

This testimony was corroborated by that of Chester County Detective Carroll, who testified that there was no deal of any kind between Lubking and the police. Furthermore, Detective Lampman, also of the Chester County Detective's Office, testified that Lubking was not scheduled to be interviewed as part of the investigation, thus belying

29

Matteo's argument that Lubking cooperated to deflect suspicion from himself. Nor was there any evidence suggesting that Lubking believed he was a suspect in Calandriello's killing. We will not speculate or infer the existence of a quid pro quo agreement simply because the informant's motives may not have been entirely altruistic. The record shows that Lubking was not a suspect in the crime, had little to gain by cooperating with the investigation, and in fact received no compensation or benefits of any kind. Under these circumstances, we agree with the state court that Lubking neither sought nor received any benefit for his cooperation with the police.

Matteo next argues that Lubking was acting under instructions from the police, a factor identified in Henry, see 447 U.S. at 270, but not relied upon by the state court. Matteo cites the fact that authorities showed Lubking how to use the recording equipment on the phone and directed him not to ask questions or otherwise elicit information from Matteo. We do not believe these instructions are the kind contemplated by Henry. The instruction on how to operate the recording device was trivial and does not pose a problem of constitutional dimension. As for the instruction not to elicit information from Matteo, it would be perverse to hold that police informants may not deliberately elicit information and yet to forbid police from notifying potential informants of this fact. In many circumstances, such a holding would preclude police from using informants at all, a result we find untenable. Consequently, we are not convinced by Matteo's argument that Lubking was acting under police instructions.

On the other hand, there is some evidence of an agency relationship in this case. Lubking was not a jailhouse acquaintance, but a trusted friend of Matteo's. See 447 U.S. at 270. The police therefore knew that Matteo would be relatively more likely to make incriminating statements to Lubking. In addition, Matteo was in custody at the time of the elicitation. See id. (examining whether defendant was in custody with formal charges pending when the incriminating statements were elicited). As the Supreme Court has held, "the mere fact of custody imposes pressures on the accused; confinement may bring into play

30

subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." Id. at 274. The use of an informant in these circumstances "intentionally creat[es] a situation likely to induce [the accused] to make incriminating statements without the assistance of counsel," and therefore is significant to a finding of agency. Id. At the time of his conversations with Lubking, Matteo had been arrested for murder, preliminarily arraigned, and incarcerated. Certainly, the "special pressures" of custody were present.

On balance, however, we agree with the state court that Lubking was not acting as a government agent at the time of the phone calls. To the extent the issue is a close one, AEDPA directs us to defer to the state court decision. See O'Brien, 145 F.3d at 27 ("We regard the question as a close one -- but, under AEDPA's newly minted standard of review, the very closeness of the call militates strongly against the granting of habeas relief."). Therefore, we hold the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

C. Deliberate Elicitation

Under Massiah and its progeny, the petitioner also must show "deliberate elicitation" of incriminating statements by the police informant. Matteo argues that Lubking deliberately elicited incriminating statements from him in both the first and second telephone conversations. In the first conversation, Matteo claims, Lubking deliberately elicited information about the location of the gun by falsely telling Matteo he was not working for the police. This falsehood allegedly induced Matteo to tell Lubking where the gun was hidden. Regarding the second conversation, Matteo bases his claim on the fact that Lubking asked several questions about the precise location of the gun: for example, "So it's not in the grass?"; "So it's almost underneath the bridge?"; "Was it frozen?"; and "Was the water frozen when you dropped it?" We must determine whether the state court's decision that these statements did not qualify as "deliberate elicitation" was contrary to, or an unreasonable application of, the relevant Supreme Court precedent.

The Supreme Court has made clear that "the primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). Accordingly, a defendant does not prove a Sixth Amendment violation "simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Id. Applying this reasoning, the Court in Kuhlmann found no constitutional deprivation where police placed a man who had previously agreed to act as an informant in the same jail cell as the suspect, who then spontaneously made incriminating remarks to the informant. The lesson of Kuhlmann, we believe, is that the use of an informant -- even surreptitiously and through prior arrangement-- does not violate the Sixth Amendment so long as the informant merely listens to and reports the incriminating statements, rather than affirmatively seeking to induce them. See Brink, 39 F.3d at 422 (noting that the Sixth Amendment requires an informant to be no more than a passive "listening post"). In this sense, the limitations on police conduct are analogous to those imposed by the entrapment defense, where police may use undercover agents to afford opportunities to break the law but may not affirmatively "originate a criminal design" or "implant in an innocent person's mind the disposition to commit a criminal act." Jacobson v. United States, 503 U.S. 540, 548 (1992) (citing Sorrells v. United States, 287 U.S. 435, 442 (1932)).

Matteo argues his case is more similar to Maine v. Moulton, 474 U.S. 159 (1985), in which the Supreme Court held the Sixth Amendment forbids "knowing exploitation by the State of an opportunity to confront the accused without counsel being present." Id. at 176; accord Henry, 447 U.S. at 274 (holding that the Sixth Amendment forbids the state from "intentionally creating a situation likely to induce [defendant] to make incriminating statements without the assistance of counsel"). In Moulton, however, the informant actively induced the defendant to make incriminating

32

statements by feigning memory loss about the events of the night in question: "Apologizing for his poor memory, he repeatedly asked Moulton to remind him about the details of what had happened, and this technique caused Moulton to make numerous incriminating statements." 474 U.S. at 166. For example, at one point the informant asked "I want you to help me with some dates. . . . [W]hat night did we break into Lothrop Ford? What date?" Id. at 166 n.5. He also " `reminisced' about events surrounding the various thefts, and this technique too elicited additional incriminating statements from Moulton." Id. at 166. Similarly, in Henry the informant took "affirmative steps" to elicit incriminating information. 447 U.S. at 271.

In contrast, Lubking's conduct did not approach this level of deliberate elicitation in either phone call. Lubking did not prompt Matteo to disclose the gun's location; rather, Matteo voluntarily called Lubking on January 27 and asked Lubking to retrieve the gun for him, obviously in an attempt to prevent the police from finding the murder weapon. Plainly, it was necessary for Matteo to tell Lubking where the gun was hidden. In fact, the entire purpose of Matteo's calls to Lubking was to enlist his help in locating the rifle, a task that necessarily required Matteo to furnish Lubking with details of the gun's location. Although we recognize that it is unimportant whether Matteo initiated the contact with Lubking, see Moulton, 474 U.S. at 174, we believe the voluntariness of Matteo's disclosure is relevant to the issue of elicitation. Furthermore, we note that after being notified of Matteo's initial request, the police merely "listened in" as Matteo provided the information that was essential for Lubking to carry out the task. In the first conversation, Lubking said virtually nothing at all, causing Matteo to grow suspicious and question whether he was "getting set up." This pattern was repeated in the second phone call, as Matteo willingly provided a detailed description of the gun's location and Lubking responded almost exclusively with monosyllabic rejoinders such as "okay," "yeah," "uh-huh," and the like.3 The fact that near

_____

3. According to appellee's brief, Lubking responded "okay," "yeah," or "uh-huh" 73 times in the first conversation, which lasted 10 minutes, and 32 times in the second, which lasted approximately 5 minutes. Regardless of the precise number of such responses, appellee is correct that both conversations consisted almost entirely of detailed statements by Matteo followed by one-word answers from Lubking.

the end of the second call Lubking asked a few clarifying questions, which were directly responsive to statements Matteo had just made, does not alter the fundamental nature of the exchange between the two men: namely, Matteo enlisted Lubking's help to track down the murder weapon and voluntarily provided him with the information necessary to do so.4

We are also not convinced by Matteo's argument that deliberate elicitation is proved by Lubking's statements in the first conversation that he was not acting at the behest of police. Although the statements were false, we are aware of no rule suggesting that deliberate elicitation occurs whenever an informant misrepresents that he is not cooperating with authorities. Matteo claims such a principle is established by the following statement in Moulton: "By concealing the fact that [the informant] was an agent of the State, the police denied [defendant] the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment." Id. at 177. But we do not interpret this language to mean that police informants must disclose, if asked, that they are cooperating with the authorities, or else any incriminating statements made to them are excluded by the Sixth Amendment. If that were the case, criminal suspects could easily circumvent all undercover investigative techniques. Rather, "[w]hen an accused voluntarily chooses to make an incriminatory remark in these circumstances, he knowingly assumes the risk that his confidant may be untrustworthy." Henry, 447 U.S. at 297–98 (Rehnquist, J., dissenting).

We agree with the Pennsylvania Superior Court's determination that Lubking did not deliberately elicit incriminating information from Matteo in either phone call. Certainly, we do not believe the state court decision contravened established Supreme Court precedent to the

_____

4. To hold that Lubking's few clarifying questions constituted "deliberate elicitation" under Massiah would imply that a Sixth Amendment violation hinged on whether Matteo successfully communicated the rifle's location on the first try. We do not believe Matteo's inability to do so affects the substance of the conversations, both of which make clear Matteo voluntarily disclosed the rifle's location.

34

extent that it could be characterized as "contrary to" the applicable body of law. Nor do we find its holding to be an objectively "unreasonable application of" this law. As noted, the "primary concern" of the Massiah doctrine is to proscribe "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." Kuhlmann, 477 U.S. at 459; Moulton, 474 U.S. at 177 n.13 (finding Sixth Amendment violation because the elicitation in that case was " `the functional equivalent of interrogation' ") (quoting Henry, 447 U.S. at 277 (Powell, J., concurring)). In this case, it was objectively reasonable for the state court to conclude that police conduct did not amount to surreptitious interrogation of Matteo but consisted merely of listening as Matteo voluntarily revealed incriminating information to Lubking. Consequently, we do not believe the state court's decision was contrary to, or an unreasonable application of, the Massiah line of cases.

IV. Harmless Error

We also note that even if a Sixth Amendment violation had occurred, we would still affirm on the grounds that the state court's failure to exclude the recorded conversations and the gun was harmless. The other evidence against Matteo, although circumstantial, was very strong. The jury still would have been presented evidence that Lubking loaned Matteo a .22 caliber rifle that was never returned and that this rifle was consistent with the type of gun that killed Calandriello. Additionally, the following facts still would have been presented to the jury: Matteo and Calandriello had scheduled a meeting for noon on January 13, 1998; Calandriello left for this meeting and never returned; Calandriello's car and apartment keys were found in Matteo's apartment along with a wad of $100 bills similar to the bills Calandriello told friends he would bring to the meeting with Matteo; Matteo was picked up by John Stanchina at the Holiday Inn parking lot where the body was soon found; blood consistent with Calandriello's and only 3 percent of the population was found in Matteo's garage; and Matteo's sneakerprint was found on the rear bumper of the car containing the body. Under these circumstances, we believe the admission of the

35

conversations and the gun had no " `substantial and injurious effect or influence in determining the jury's verdict.' " California v. Roy, 519 U.S. 2, 5 (1996) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). We therefore find it unnecessary to decide whether the Pennsylvania Superior Court correctly concluded that the police inevitably would have discovered the gun.

V. Conclusion

The state court decision was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Accordingly, the District Court correctly dismissed Matteo's habeas petition.

We will affirm the judgment of the District Court.

36